# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 9, 2009        Decided December 22, 2009

No. 08-1224

JACKSON COUNTY, NORTH CAROLINA ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

DUKE ENERGY CAROLINAS, LLC AND UNITED STATES
DEPARTMENT OF THE INTERIOR,
INTERVENORS

---

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

---

*Philip M. Marston* argued the cause for the petitioners.
*Paul V. Nolan* was on brief.

*Jennifer S. Amerkhail*, Attorney, Federal Energy Regulatory
Commission, argued the cause for the respondent. *Cynthia A.
Marlette*, General Counsel, and *Robert H. Solomon*, Solicitor,
were on brief.

*John C. Cruden*, Acting Assistant Attorney General, United
States Department of Justice, and *Robert J. Lundman* and *John*

*L. Smeltzer*, Attorneys, were on brief for intervenor United States Department of the Interior.

*John A. Whittaker, IV* was on brief for intervenor Duke Energy Carolinas, LLC.

Before: HENDERSON and TATEL, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Petitioners Jackson County, N.C., Town of Franklin, N.C. and the Friends of Lake Glenville Association, Inc. challenge orders of the Federal Energy Regulatory Commission (FERC or Commission) which granted the application of Duke Energy Carolinas, LLC (Duke) to surrender its license to operate the Dillsboro, N.C. hydroelectric project (Dillsboro Project) and to remove the project's dam and powerhouse. *See Duke Energy Carolinas, LLC*, 120 F.E.R.C. ¶ 61,054 (July 19, 2007) (*Surrender Order*), *reh'g granted in part*, 123 F.E.R.C. ¶ 61,069 (Apr. 22, 2008) (*Rehearing Order*). We deny the petition for review because the challenged decisions are not "arbitrary and capricious or otherwise contrary to law." *Transmission Agency of N. Cal. v. FERC*, 495 F.3d 663, 671 (D.C. Cir. 2007) (internal quotation omitted).

**I.**

The Dillsboro Project, one of seven hydroelectric projects Duke operates in North Carolina's Nantahala and Tuckasegee River Basins, consists of a concrete masonry dam and a powerhouse with two generating units on the Tuckasegee River in Jackson County. In July 2003, Duke applied to FERC to renew its license to operate the Dillsboro Project after its then-effective license expired on July 31, 2005. In the application cover letter, however, Duke advised FERC that it might thereafter apply to surrender its license instead. In May 2004,

Duke filed an application to surrender the license, proposing to remove the project's dam and powerhouse pursuant to two settlement agreements—the Nantahala Cooperative Stakeholder Team's Settlement Agreement (Nantahala Agreement) and the Tuckasegee Cooperative Stakeholder Team's Settlement Agreement (Tuckasegee Agreement). Each settlement agreement had been approved by a majority of "stakeholders" in the respective river basin (Nantahala or Tuckasegee), including various resident and property associations, environmental and wildlife organizations, North Carolina environmental agencies, the U.S. Fish and Wildlife Service (FWS) and the U.S. Forest Service. The Tuckasegee Agreement provided for the surrender of the Dillsboro license (and removal of the dam and powerhouse), while Duke's relicensing applications for three other Tuckasegee River hydroelectric projects—the Bryson, East Fork and West Fork Projects—would proceed. The Nantahala Agreement covered the Franklin, Mission and Nantahala Projects in the Nantahala River Basin and provided that all three should be relicensed and remain in operation.[1] Attached to the Dillsboro surrender application was an "Environmental Assessment and Biological Assessment" analyzing the effects of various alternative actions Duke could take with regard to the Dillsboro dam (no action, partial dam removal or full dam removal) and the powerhouse (no action, powerhouse closure or powerhouse removal).

On June 16, 2005, a group of 12 stakeholders (the petitioners among them) submitted an "Offer of Preferred Settlement Agreement." The accompanying "Tuckasegee River and Nantahala Area Preferred Settlement Agreement" (Preferred

---

[1]The licenses for Bryson, Franklin and Mission expired in mid-2005; the licenses for East Fork, West Fork and Nantahala expired in early 2006. Relicensing applications, filed in 2003 or 2004, are currently pending for all of them.

Settlement Agreement) proposed that the Tuckasegee Agreement be revised to provide that the Dillsboro Project be relicensed, that Duke transfer its license, its equipment and all interests in the Project to Jackson County (or its designee) as a charitable contribution and that Duke contribute $500,000 to state agencies "for river, stream and lakeshore restoration" and take measures to safeguard the River, the Project and local wildlife. Preferred Settlement Agreement, *Duke Energy Carolinas, LLC*, Project Nos. P-2602-005, -007, at 11-12 (June 16, 2005).

The Commission issued a final Environmental Assessment (EA) on July 14, 2006, setting out as its "recommended alternative" the complete removal of the Dillsboro dam and powerhouse, as Duke had proposed. Final Environmental Assessment for Hydropower Licenses—Nantahala East Projects, *Duke Energy Carolinas, LLC*, Project Nos. P-2602-005, -007, at 352-54 (July 2006). The EA determined that, despite "significant short-term effects"—including effects "on habitat for the Appalachian elktoe mussel, a federally endangered species"—removing the dam and powerhouse would not cause resources ("including geology, water quantity and quality, fisheries, terrestrial, aesthetic, cultural, and recreational" resources)—to experience "significant long-term adverse effects." *Id*. at 389. In particular, the EA found that the action, as proposed, would (1) "restore the river to free-flowing riverine conditions and allow continuous access to 9.5 miles of upstream river habitat previously blocked by Dillsboro Dam," *id*. at 146; and (2) "benefit the populations of the Appalachian elktoe in the Tuckasegee River" because the "increase in available habitat would improve [the elktoe's] overall abundance . . . and contribute to the FWS recovery efforts for the species," *id*. at 191, 193. Accordingly, the EA concluded the license surrender and dam/powerhouse removal "would not constitute a major

federal action significantly affecting the quality of the human environment." *Id.* at 389.[2]

In August 2006, the FWS filed its "Biological Opinion" (BiOp) concluding that the "incidental take" that "may occur . . . as a result of demolition activities associated with the decommissioning of the Dillsboro Dam" is "not likely to result in jeopardy to the Appalachian elktoe." Biological Opinion, *Duke Energy Carolinas, LLC*, Project Nos. P-2602-005, -007 (Aug. 20, 2006), at 43, 45.[3]

On July 19, 2007, FERC issued the *Surrender Order* which granted Duke's surrender application, approving removal of the dam and powerhouse, and dismissed Duke's mooted application for relicensure. *See Surrender Order*, 120 F.E.R.C. at 1 ¶ 1. In the order, FERC concluded that, notwithstanding "short-term environmental impacts and . . . a loss of 0.225 MW of capacity," surrender "will benefit environmental resources in the Tuckasegee River, and is in the public interest" because it "will

---

[2]"Under the National Environmental Policy Act, federal agencies are required to prepare an environmental impact statement . . . for 'every . . . major Federal action[ ] significantly affecting the quality of the human environment.' " *City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181, 1189 (D.C. Cir. 2007) (quoting 42 U.S.C. § 4332(2)(C)) (first ellipsis added). "At a minimum, agencies contemplating a major federal action must prepare an 'environmental assessment' to determine whether the action will cause a 'significant' environmental impact." *Id.* (citing 40 C.F.R. § 1508.9(a)).

[3]FERC had requested FWS's opinion pursuant to its duty under the Endangered Species Act to "consult[] with" FWS to "insure that any action authorized, funded, or carried out by [FERC] is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined . . . to be critical." 16 U.S.C. § 1536(a)(2).

result in greater upstream and downstream fish movement, wider distribution of Appalachian elktoe mussels, as well as improvement of recreational opportunities in the Tuckasegee River." *Id.* at 20 ¶ 50. The Commission also imposed measures to safeguard the Appalachian elktoe and to minimize the downstream transport of sediments and directed that Duke construct a new public boat launch and parking area.

Various parties filed requests for rehearing and clarification, among them a group of entities that included the petitioners. Requests for Rehearing of Jackson County, N.C. et al., *Duke Energy Carolinas, LLC*, Project Nos. P-2602-005, -007 (Aug. 20, 2007) (Jackson County Rehearing Request). The petitioners' request asked that the Commission rescind the *Surrender Order* on various grounds and reinstate the Dillsboro Project license. FERC rejected the request in its April 22, 2008 *Rehearing Order*. The petitioners filed a timely petition for review of FERC's orders.

**II.**

As a preliminary matter Duke challenges the petitioners' standing under Article III of the U.S. Constitution to bring this action. "The 'irreducible constitutional minimum of standing contains three elements': (1) injury-in-fact, (2) causation, and (3) redressability." *Ass'n of Flight Attendants—CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 464 (D.C. Cir. 2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)) (internal quotation omitted). To establish injury, a petitioner " 'must[, inter alia,] show . . . it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.' " *Dominion Transmission, Inc. v. FERC*, 533 F.3d 845, 852 (D.C. Cir. 2008) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc.*, 528 U.S. 167, 180 (2000)) (internal quotations omitted) (alterations in original). Duke contends Jackson County lacks standing because it has not produced "any rigorous

data or studies demonstrating the required 'substantial probability,' " Intervenor Duke's Br. 24 (quoting *Grassroots Recycling Network, Inc. v. EPA,* 429 F.3d 1109, 1112 (D.C. Cir. 2005)), to support its "assert[ions] that [the Dillsboro Project] plays a 'significant socio-economic role in the Town of Dillsboro' and in the County and . . . is important to tourism and has aesthetic value significant to tourism," *id*. (quoting Pet'rs' Br. 2) (citing *id*. at 8). We conclude, however, that Jackson County has alleged a sufficient injury-in-fact, namely "the threatened physical destruction of property within its borders," which will substantially alter Jackson County's geography by converting a dammed lake into a free flowing river and eliminate a possible power source. Because Jackson County has standing to bring this action, we need not inquire into the standing of the other two petitioners as all three parties make the same arguments in joint briefs. *See Comcast Corp. v. FCC*, 579 F.3d 1, 6 (D.C. Cir. 2009) (" '[I]f one party has standing in an action, a court need not reach the issue of the standing of other parties when it makes no difference to the merits of the case.' " (quoting *Ry. Labor Executives' Ass'n v. United States*, 987 F.2d 806, 810 (D.C. Cir 1993))). Accordingly, we address the merits of the petitioners' arguments.

### A. State Water Quality Certification

First, the petitioners contend FERC issued the *Surrender Order* based on an invalid section 401 certification issued by the North Carolina Division of Water Quality (NCDWQ). Section 401 of the Clean Water Act (CWA), 33 U.S.C. § 1341, requires that an "applicant for a Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate, that any such discharge will comply with the applicable provisions of [33 U.S.C.] sections 1311, 1312, 1313,

1316, and 1317." 33 U.S.C. § 1341(a)(1).[4] Section 401 further directs that each State must "establish procedures for public notice in the case of all applications for certification by it and, to the extent it deems appropriate, procedures for public hearings in connection with specific applications," 33 U.S.C. § 1341(a)(1)—a provision we have interpreted to "also require[] states to *comply* with their public notice procedures, and therefore [to] require[] FERC to obtain some minimal confirmation of such compliance, at least in a case where compliance has been called into question." *City of Tacoma, Wash. v. FERC*, 460 F.3d 53, 68 (D.C. Cir. 2006). North Carolina has established a certification procedure which generally requires notice by publication in a local newspaper of "each pending application for an individual certification" at least 15 days before NCDWQ final action and not more than 20 days after the application is accepted. 15A N.C. Admin. Code § 2H.0503(a).[5] Duke applied for section 401 certification as required but NCDWQ apparently failed to publish the required notice of the application. Jackson County argues, as it did on rehearing, that the lack of notice rendered the 2005 certification invalid. We disagree.

---

[4]The enumerated provisions set out requirements for effluent limitations and water quality standards.

[5]In addition, if NCDWQ decides to conduct a hearing on the application, it must provide notice thereof by publication 30 days before the hearing. 15A N.C. Admin. Code § 2H.0503(d). To the extent Jackson County claims injury from NCDWQ's failure to provide public notice of its intent to act on Duke's application, *see* Pet'rs' Br. 29 (citing 15A N.C. Admin. Code 2H.1303(a)(1)), Jackson County relies on an inapplicable regulation. *Compare* 15A N.C. Admin. Code 2H.0503 (governing "PUBLIC NOTICE" for "WATER QUALITY CERTIFICATION") *with* 15A N.C. Admin. Code 2H.1303(a)(1) (cited by petitioners).

Duke filed its "Application for 401 Water Quality Certification for License Surrender" with NCDWQ, attached to a cover letter dated March 11, 2005. Duke filed copies of the application with FERC on March 17, 2005 and on March 28, 2005, mailed copies of the cover letter—stamped as "received" by NCDWQ on March 17, 2005—to FERC and to all parties to the FERC surrender proceeding, including Jackson County. *See* Letter from Garry S. Rice, Duke Associate General Counsel to FERC, *Duke Energy Carolinas, LLC*, Project Nos. P-2602-005, -007 (Mar. 29, 2005); Pet'rs' Br. 30 n.23 (acknowledging Jackson County was served with stamped copy on March 29, 2005). Thus, Jackson County had timely actual notice of the state certification application upon its receipt of same and the purpose of section 401's notice by publication requirement was thereby fulfilled. Accordingly, we conclude that NCDWQ's failure to comply with the statutory notice requirement was harmless. *Cf. Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 116 F.3d 520, 531 (D.C. Cir. 1997) (" '[E]ven if [an] agency has not given notice in the statutorily prescribed fashion, actual notice will render the error harmless.' " (quoting *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983))) (first alteration added); *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659-60 (2007) (" 'In administrative law, as in federal and criminal litigation, there is a harmless error rule.' " (quoting *PDK Labs., Inc. v. U.S. Drug Enforcement Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004))).[6]

---

[6]Jackson County claims in its reply brief it was "assured by the DWQ that the 2005 Certification was 'for surrender' and that a subsequent 401 certification would be required for dam removal." Reply Br. 25 (citing letter from NCDWQ). The certification application, however, expressly identified the subject "project" as "removal of the Dillsboro Dam" and the certification itself references dam removal in two places. *See* Certification Application for 401

### *B. Environmental Assessment*

Jackson County raises several objections to FERC's EA. We address the objections seriatim.

First, Jackson County asserts that FERC improperly "segmented" its review of the four Tuckasegee projects from the three Nantahala projects and from each other. We believe the Commission appropriately limited the scope of its review. It is true that "[a]gencies may not evade their responsibilities under NEPA by artificially dividing a major federal action into smaller components, each without 'significant' impact.' " *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 68 (D.C. Cir. 1987) (citing *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 298 (D.C. Cir. 1987)). "The rule against segmentation, however, is not required to be applied in every situation. To determine the appropriate scope for an EIS, courts have considered such factors as whether the proposed segment (1) has logical termini; (2) has substantial independent utility; (3) does not foreclose the opportunity to consider alternatives, and (4) does not irretrievably commit federal funds for closely related projects." *Taxpayers Watchdog, Inc.*, 819 F.2d at 298. In this case, FERC

---

Water Quality Certification, *Duke Energy Carolinas, LLC*, Project Nos. P-2602-005, -007, at 11-12 (filed Mar. 17, 2005), at 4; *id*, N.C. Water 401 Quality Certification, at 3 (filed Mar. 24, 2005) (conditions 5, 6). In fact, surrender alone, without removal, would not result in a "discharge into the navigable waters," 33 U.S.C. § 1341(a)(1), so as to trigger the certification requirement. *See John C. Jones*, 107 F.E.R.C. ¶ 61,279, 62,309 n.8 (2004) ("[U]nder section 401(a) of the Clean Water Act, 33 U.S.C. § 1341(a), water quality certification is required only if a proposed activity would result in a discharge into the waters of the United States. Such a discharge would be created by removal of the dam but not by mere surrender of an exemption."). Duke did obtain a second compliance certification from NCDWQ, issued on November 21, 2007, approving the method it proposed to use to remove the dam.

did not "segment" the individual Tuckasegee projects but instead considered all four in a single EA and, as the petitioners acknowledge, did indeed address the cumulative effects of the four projects—if not with the result the petitioners desired. *See* EA at 44-45 (setting out scope of cumulative effects analysis); *id*. at 105-06, 156-57, 284-85 (analyzing cumulative effects on water quantity and quality, aquatic resources and recreational resources); Jackson County Reh'g Req. at 53 (asserting *Surrender Order* "ignores the associated cumulative impacts to which the EA devoted considerable ink (though little wisdom)"). Throughout, FERC noted in particular the interconnectedness of the East and West Fork Projects with the Dillsboro dam because the flow from the former projects largely determined the capacity of the latter project as a "run-of-the-river" project. *See, e.g.*, *Surrender Order* at 2 ¶ 4; *Rehearing Order* at 2 ¶ 4, at 23 ¶ 65 n.73. That FERC treated the two Nantahala River projects and the Tuckasegee River projects separately was reasonable under *Taxpayers Watchdog, Inc.*, 819 F.2d at 298. The Nantahala projects are geographically distinct from the Tuckasegee projects, located on a separate river and covered by a separate, albeit related, settlement agreement. Nor is it true, as Jackson County seems to suggest, that approving the license surrender and dam removal for the Dillsboro Project—the so-called "linchpin" of the two settlement agreements, *see*, *e.g.*, Pet'rs' Br. 49—will automatically trigger FERC approval of the other features of the two settlements. Each project's relicensing application requires separate approval by FERC based on an analysis thereof. *See* 16 U.S.C. § 797(e) ("Issue of licenses for construction, etc., of dams, conduits, reservoirs, etc."); *see generally* 18 C.F.R. ch. I, subch. A, pt. 4 ("Licenses, Permits, Exemptions, and Determination of Project Costs").

Second, Jackson County asserts FERC failed to consider alternatives to license surrender and dam/powerhouse removal—in particular, alternatives to licensure surrender which would keep the project licensed and operating in some form,

such as the proposal in the Preferred Settlement Agreement to relicense the Dillsboro Project and transfer it to Jackson County. *See also* Pet'rs' Br. 60 (suggesting "relicensing the Dillsboro Project by the current licensee" and "commencing a new round of competition"); *id*. at 63 ("alternative of *enhancing* renewable energy generation at the site") (emphasis in original). FERC dismissed such alternatives, however, in reliance on its long-held policy that it lacks authority to relicense or transfer a license and facilities without the licensee's consent. *See Surrender Order* at 13 ¶ 28 ("A licensee cannot be required to retain or renew its license if it wishes to surrender. Likewise, the Commission cannot compel a transfer, and in any case, no entity developed a transfer proposal, nor has Duke expressed any interest in one.") (footnotes omitted) (citing *Ariz. Pub. Serv. Co.*, 109 F.E.R.C. ¶ 61,036 at ¶ 39 & n.34 (2004)); *Wellesley Rosewood Maynard Mills, L.P.*, 108 F.E.R.C. ¶ 61,048 (2004); *Rehearing Order* at 12, ¶ 31 n.41 ("[W]e cannot force a licensee to seek a new license for its project upon expiration of the existing license. Thus, given Duke's express desire to surrender its license, any alternative predicated on the company's receiving a new license is not feasible and merits no further consideration."). While Jackson County offered before the Commission to assume responsibility for the dam and powerhouse, and thereby save Duke the costs of removal and mitigation, it did not then challenge FERC's transfer policy itself and is therefore foreclosed from doing so now. *See Save Our Sebasticook v. FERC,* 431 F.3d 379, 381-82 (D.C. Cir. 2005) (petitioner forfeited challenge not raised before FERC to Commission's "legal principle" that it "may not compel" licensee that applies to surrender license "to continue operating the project" (citing 16 U.S.C. § 825*l*(b)). Jackson County also contends FERC improperly ignored "alternatives regarding fish passage proposed by Jackson County." Pet'rs' Br. 63. FERC reasonably rejected this alternative, however, concluding that "while the Commission may have the authority to order the

construction of such facilities as a condition of license surrender, [it] would have no jurisdiction to require ongoing maintenance and monitoring to ensure their effectiveness." *Rehearing Order* at 12 ¶ 32.[7]

Finally, Jackson County argues, summarily, that FERC violated 18 C.F.R. § 385.602 which "provides that an offer of settlement may be submitted by any party to a proceeding" as well as FERC's (unidentified) "prior cases" when it "fail[ed] to review [the "Offer of Preferred Settlement Agreement"] as a legitimate offer of settlement." Pet'rs' Br. 69. FERC considered the Preferred Settlement Agreement but rejected it as "simply a recitation of the filer's position" and "a settlement agreement in name only" because "[n]either Duke, the licensee, nor any of the federal and state resource agencies that have played a major role in the Dillsboro surrender are parties to it." *Surrender Order* at 6 ¶ 12 n.14. This characterization of the document was not arbitrary or capricious.

---

[7]Jackson County also asserts the EA improperly relied on FWS's BiOp because the BiOp "contained multiple factual and analytic errors." Pet'rs'. Br. 64. The alleged errors, however, are either immaterial to the BiOp's scientific determinations (characterization of Dillsboro Project as currently operational), matters of non-factual opinion (opinion dam removal "will not adversely affect aesthetics and other recreational values," BiOp at 14) or related to segmentation issues we have addressed above (effect of upstream projects on Appalachian elktoe). Accordingly, they provide no ground for upsetting FERC's decisions. Granted FWS signed on to the Tuckasegee and Nantahala Agreements before drafting the BiOp (a practice FWS has apparently ceased, *see* Pet'rs' Br. 67 & n.30) but Jackson County offers no reason to infer that FWS's status as signatory to the settlement agreements biased its staff's scientific determinations as expressed in the subsequently issued BiOp.

For the foregoing reasons, the petition for review is denied. We emphasize that nothing in this opinion should be construed to affect the relicensing proceedings for the other six Nantahala and Tuckasegee River projects currently pending before the Commission. *See supra* p. 3 n.1.

*So ordered.*